**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KEVIN SPENCER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **06 4615** |
| | ) | |
| **KFC CORPORATION,** | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

Colonel Harland Sanders founded Kentucky Fried Chicken in 1952 based on a secret blend of eleven herbs and spices that he formulated in 1940. Landmark dates for KFC include 1952, when Colonel Sanders awarded the first KFC franchise via a handshake agreement that required the franchisee to pay a nickel for each chicken sold, and 1957, when Kentucky Fried Chicken was first sold in buckets. Today, perhaps due to health concerns arising from the word "fried," Kentucky Fried Chicken is known as KFC. *See* http://www.kfc.com/about/history.asp (last visited January 28, 2009).

Every day, KFC restaurants serve nearly eight million customers around the world. *See* http://www.kfc.com/about/ (last visited January 28, 2009). On July 13, 2004, plaintiff Kevin Spencer and his wife were among these millions of diners, as they chose to visit the the KFC restaurant in Rolling Meadows, Illinois. In this diversity case, Spencer contends that he severely injured his knee after slipping and falling at the Rolling Meadows KFC restaurant. KFC, on the other hand, asserts that Spencer's knee problems are the result of a preexisting softball injury.

The court conducted a two-day bench trial, and the parties subsequently submitted proposed findings of fact and conclusions of law. Pursuant to Federal Rule of Civil Procedure 52, the court hereby enters the following written findings of fact and conclusions of law , which

are based upon consideration of all the admissible evidence as well as this court's own assessment of the credibility of trial witnesses. To the extent that any findings of fact may be considered conclusions of law, they shall be deemed conclusions of law, and vice versa.

## I.      Findings of Fact

*Background*

1.      At the time this lawsuit was filed, KFC was a Delaware corporation with its principal place of business in Louisville, Kentucky. On July 13, 2004, KFC owned, operated, managed, maintained and controlled the KFC restaurant located at 5540 S. New Wilke Road, Rolling Meadows, Illinois.

2.      Kevin Spencer resides in Arlington Heights, Illinois, and is an Illinois citizen. At the time of the alleged incident at KFC, he worked as a self-employed carpenter and painter. When employed, he earned an average of $100.00 per day.

3.      Spencer was diagnosed with Osgood-Schlatter's disease in his childhood. Osgood-Schlatter's disease affects the patellar tendon, which connects the kneecap (the patella) to the shin bone. *See* http://emedicine.medscape.com/article/827380-overview (last visited on Jan. 28, 2009). Spencer testified that this condition caused him to have a calcium bump under his knee on the shin area, but otherwise did not cause pain or restrict his activities in any way.

4.      Spencer contends that in June of 2004, he injured his right knee in two separate incidents. The first occurred while Spencer participated in a softball game on June 14, 2004, and the second occurred on July 13, 2004, while Spencer was dining at the Rolling Meadows KFC. Spencer seeks over $1,300,000 in damages from KFC.

5.    Spencer was subsequently involved in another slip-and-fall incident at a Menard's store in August of 2007. Spencer testified that he slipped and fell while attempting to pick up a piece of wood from a bin at Menard's. He bumped his head and injured his back, and received treatment at Castle Chiropractic.

*June 14, 2004 Incident (Softball Injury)*

6.    On June 14, 2004, Spencer injured his right knee playing softball. According to Spencer, he hit the ball, ran the bases and in the process "slid in the sand, twisted and fell down." Spencer Transcript at 16.

7.    Two days later, on June 16, 2004, Spencer sought medical attention for this injury at the Northwest Community Hospital emergency room. Although Spencer had his own car, his neighbor drove him to the emergency room. Spencer testified that "there was no reason" why his neighbor drove him to the emergency room. *Id*. at 43.

8.    At the emergency room on June 16, 2004, Spencer informed the treating physician that during the softball incident, his knee twisted and "dislocated," and that he felt it pop. *Id*. at 17]. Spencer also told hospital staff that his right knee was swelling and causing him pain, and that on a scale of 10, the pain level was 4 or worse.

9.    These statements are consistent with emergency room records from June 16, 2004, that quote Spencer as stating that his "knee dislocated but popped back in." Plaintiff's Exhibit 12 (Northwest Community Hospital Emergency Room Records from June 16, 2004) at 2. The emergency room records also state that Spencer had a large effusion in his right knee. Effusion is fluid in the joint that is indicative of inflammation or bleeding in the joint, or both.

10. Emergency room staff told Spencer to wear a knee immobilizer, use crutches, and elevate and ice his knee as necessary. The treating physician also prescribed fifteen Vicodin tablets to treat pain related to the softball injury, and told Spencer to make an appointment with an orthopedic doctor if he continued to have problems with his knee.

11. Spencer testified that he did not seek any further treatment for the softball injury because his knee "started to get better." He further testified that within two weeks of the incident, he was no longer experiencing pain or discomfort in his knee and was back to his regular work routine. Spencer Transcript at 19.

12. Spencer did not point to any evidence indicating that he returned to work during the period of time between the softball incident on June 14, 2004, and the KFC incident on July 13, 2004.

*July 13, 2004 Incident (Slip and Fall at KFC Restaurant)*

13. On July 13, 2004, Spencer and his wife dined at the KFC in Rolling Meadows, Illinois. At that location, the men's restroom is located off a hallway that is accessed via a solid wood door that opens inward to the right.

14. According to Spencer, he slipped and fell in the hallway leading to the restrooms. Specifically, he testified that:

I was going to use the bathroom, and there's a door that opens up to a hall where the bathrooms are. I used my right hand to open the door. I took one step into the hall, and my foot had slid out right underneath me. At this point, I grabbed the handle as hard as I could to prevent falling. My leg had slid forward, somewhat jackknifed back, and then at that point my body contortioned [sic] and twisted. My left arm swung up and hit the door frame of the door opening, and then at that point I pulled the door, hit my knee and then twisted my body and fell backwards.

Spencer Transcript at 19-20.

15. Spencer testified that a third party sitting nearby saw him fall, and that his attorney had this person's contact information. This witness did not testify at trial. He then stated that because he could not walk, he crawled back to his seat. Spencer's wife was dining with him, and according to Spencer, saw him crawl back to the table where they were eating. Spencer's wife did not testify at trial.

16. Annette Kelley and Dominga Serrano, who were employed by KFC and were working at the Rolling Meadows KFC on the date of the incident, testified via deposition. They stated that on the day of Spencer's alleged fall, condensation was forming on the floors at various intervals of time as a result of a broken air conditioning unit.

17. The Rolling Meadows KFC learned about the problem with the air conditioning unit approximately one week prior to the July 13, 2004, incident involving Spencer. At that time, the KFC employees called the air conditioning repair company, which attempted to repair the air conditioning unit.

18. According to Kelley, before the air conditioner was repaired, the floor was damp, as opposed to wet, and the moisture was visible to the naked eye. Because KFC employees were aware of the condensation, they regularly mopped the area. Additionally, they placed several yellow warning signs inside the restroom vestibule and outside the solid wooden door to warn customers about the wet floor.

19. On July 14, 2004, the day after Spencer's alleged fall, a technician examined the air conditioning unit and ordered a part, and KFC subsequently repaired the air conditioning unit.

20. Spencer was taken by ambulance to Northwest Community Hospital emergency room, where he had received treatment one month earlier following the softball injury. Spencer

testified that he could not recall whether or not the paramedics asked if he had ever hurt his knee before. The EMS Rescue and Ambulance Report for Spencer's transport from KFC to the Emergency Room states: "PAST MEDICAL HISTORY: None."

21. Upon arriving at the emergency room, Spencer testified that his "knee was in excruciating pain and that [he] had hit [his] arm and landed on [his] tailbone." Spencer Transcript at 21.

22. The emergency room records regarding Spencer's treatment on July 13, 2004 state that Spencer "bumped his head", and that he had a small bruise on his forearm. The records do not reflect any statements by Spencer about bumping his knee against the door prior to falling, or about bruises on his knee. The emergency room records also state, "Past Medical History: None." At trial, Spencer asserted that he told the emergency room personnel that he had "some x-rays done here a month ago" but this is not reflected in the records. Similarly, the records do not indicate that Spencer ever informed the emergency room personnel that he had obtained treatment at that same emergency room a month before in connection with an injury to his right knee.

23. After x-raying Spencer's knee, the emergency room physician released Spencer and told him to stay off his leg, use crutches and follow up with an orthopedic surgeon if necessary.

*Dr. Hill*

24. On July 22, 2004, Spencer went to Dr. James M. Hill, an orthopedic surgeon, to address issues with his right knee. Dr. Hill's notes for this visit provide that: "The patient states that he was walking to the bathroom when he slipped on a wet floor. This resulted in a hyperextension-type injury to his right knee when he fell backwards landing on his

buttocks." Plaintiff's Trial Exhibit 15 at 1. Dr. Hill's treatment notes and his testimony both do not reflect that Spencer ever told Dr. Hill that he bumped his knee against the door when he fell.

25. Dr. Hill's treatment notes for July 22, 2004 also state: "He [Spencer] denies any previous history of knee problem or injury." *Id*. Dr. Hill testified that he specifically asked Spencer whether he had any prior injuries to his right knee, and that Spencer told him that he had no such prior injuries.

26. During the July 22, 2004, visit, Dr. Hill found marked joint effusion (*i.e.*, fluid formation) in Spencer's right knee. According to Dr. Hill, the effusion in Spencer's knee was "recurrent" and thus was more pronounced on some of the dates that he treated Spencer than on others. For example, on July 29, 2004, Dr. Hill noted mild effusion in plaintiff's right knee, and on August 26, 2004, he noted moderate effusion.

27. Dr. Hill recommended physical therapy for Spencer, which he received at Athletico from July 31, 2004 through September 25, 2004. Spencer did not inform the therapist at Athletico that he had sustained a knee injury previous to the KFC incident.

28. On December 13, 2004, Dr. Hill performed outpatient arthroscopic surgery on Spencer's right knee. The surgery took sixty-five minutes. During the arthroscopic surgery, Dr. Hill determined that Spencer had suffered an osteochondral lesion of the lateral femoral condyle in his right knee. The lateral condyle is one of the two projections on the lower extremity of femur (the thigh bone), while an osteochondral lesion is a tear or fracture in the cartilage covering one of the bones in a joint.

29. Dr. Hill last treated plaintiff for complaints of pain related to an osteochondral lesion of the lateral femoral condyle in his right knee on June 14, 2005. During the June 14, 2005,

office visit with Dr. Hill, Spencer complained of "minor" discomfort in his right knee and stated that he had been able to resume recreational athletic activities. Dr. Hill testified that as of the time of this office visit, it was his "feeling that things had come along pretty nicely and that most of [Spencer's] pain had resolved." He further testified that he was "convinced that the original bone lesion had healed itself both clinically and radiographically." Finally, he testified "that the rest of [Spencer's] minor symptoms should resolve spontaneously" and that he "would see [Spencer] back in the office only as needed." Hill Deposition at 31-34.

30.     Dr. Hill saw Spencer on May 22, 2007, for a follow-up appointment. This turned out to be the final time Dr. Hill treated Spencer. At this time Spencer complained of pain along the lateral joint line, as he had in the past, but also of what Dr. Hill characterized as a "new component" of pain in the parapatellar region, which is just medial or lateral to the patella. *Id*. at 37-38. Dr. Hill opined that it was possible that Spencer was experiencing pain from the original osteochondral lesion, but there was no increased "wear and tear of the lateral compartment of the knee where the original osteochandral lesion was." *Id*. at 42. Dr. Hill then testified that Spencer's kneecap was starting to tilt to the outside of the knee and as a result Spencer, was beginning to develop patellofemoral disease (a condition that causes knee pain) that was not related to the original problem. Dr. Hill stated that a prior dislocation of the kneecap could cause the patellofemoral disease.

31.     According to Dr. Hill, patellofemoral disease can be treated with strengthening exercises and a patellofemoral knee brace, possibly followed by surgery. Dr. Hill prescribed therapy for Spencer, but did not know whether Spencer had followed up with it. Dr. Hill

also testified that there was no relationship between the patellofemoral disease and the previously treated osteochondral lesion.

32.   At trial, Spencer admitted that after the May 22, 2007, appointment, he did not schedule any further appointments with Dr. Hill because "after the exercises, it [his knee] didn't bother [him]". Spencer Transcript at 59. This is consistent with Dr. Hill's opinion, as of the date of that appointment, that Spencer's prognosis was "reasonably good." Hill Deposition at 43.

33.   During his deposition in August of 2007, Dr. Hill saw the emergency room records relating to the softball injury for the first time. After reviewing these records, Dr. Hill testified that the knee effusion for which he treated Spencer following the alleged fall at the KFC restaurant was likely the same effusion that was referenced in the June 16, 2004, emergency room records and that had originally developed as a result of the softball incident. Dr. Hill also stated that "clearly, it [the softball injury] was a significant injury to his knee before his stated injury at Kentucky Fried Chicken" and that the effusion diagnosed after the softball injury was "this same knee joint effusion that we've be [sic] evaluating the whole time." *Id*. at 49.

34.   Dr. Hill's treatment of Spencer's knee was based in part on past medical history self-reported by Spencer, who denied that he had a history of a prior knee injury. Specifically, Dr. Hill testified that he asked Spencer, "have you ever had any problems with your knee before, and he said no" despite the fact that "there's a clearly documented issue going on from an injury a month before that with joint fluid and everything else." *Id*. at 52. Indeed, once Dr. Hill found out about the softball injury, he thought that Spencer's failure to tell him about that injury when he sought treatment for the KFC

incident was so material that he questioned whether Spencer actually fell at the KFC and whether anyone saw him fall.  *Id.* at 51-52.

35.     After he learned of the prior softball injury, Dr. Hill stated that he could not testify within a reasonable degree of medical certainty that Spencer's knee problems were in fact related to the KFC incident.  He also testified that the probability that Spencer was experiencing symptoms caused by the June 14, 2004, softball injury was greater than the probability that the injury had resolved before the July 13, 2004, KFC incident.

**Dr. Hutchinson**

36.     Dr. Mark Hutchinson, KFC's expert, is a board certified orthopedic surgeon.  In forming his expert opinion, Dr. Hutchinson reviewed: (1) records from the Rolling Meadows Fire Department; (2) medical records from Northwest Community Hospital; (3) medical records from Dr. Hill; (4) medical records from Athletico Physical Therapy; (5) medical records from Castle Chiropractic; (6) a medical narrative prepared by Dr. Hill; (7) a report prepared by Dr. Michael Treister (Spencer's expert); (8) transcripts from the depositions of Spencer, Dr. Treister, and Dr. Hill; and (9) his own deposition transcript. Dr. Hutchinson did not examine Spencer or speak with Spencer.

37.     Although he offered to do so, Dr. Hutchinson was not given the opportunity to review the July 24, 2004, MRI film prior to testifying at trial.  Dr. Hutchinson also did not review the deposition testimony of Dr. Fleury, who was the treating physician at Northwest Community Hospital Emergency Room when Spencer sought treatment there following the July 13, 2004, softball injury.

38.     Based on his review of the documents and records listed in ¶ 36, Dr. Hutchinson testified that Spencer "sustained a patellar dislocation during a [softball] injury."  Hutchinson

Transcript at 71.  Dr. Hutchinson testified that the patellar dislocation "self reduced," which was consistent with Spencer's comments to the medical staff at the emergency room on July 16, 2004, that he felt his knee "pop back into place."  *Id*. at 101-02.

39.  Dr. Hutchinson also opined that the lateral femoral condyle bone bruise was more likely than not the result of a patellar dislocation.  In support, he testified that the dislocation of the patella tendon during the softball game put pressure on the lateral femoral condyle, which caused the bone bruise that was treated by Dr. Hill.

40.  Next, Dr. Hutchinson testified that it is his opinion to a reasonable degree of medical certainty that the osteochondral lesion of the lateral femoral condyle in Spencer's right knee for which Dr. Hill performed arthroscopic surgery on Spencer was caused by the softball injury on June 14, 2004, and not by the alleged fall at KFC.

41.  Dr. Hutchinson opined that his conclusion about the source of Spencer's knee problems was supported by Spencer's medical records.  His testimony pointed to numerous bases for this opinion.  The court will highlight the most important ones.  First, when Spencer went to the emergency room after the softball injury, he reported that he had a twisting injury and that he had dislocated his knee.  This description is "very consistent with a patellar dislocation."  *Id*. at 76.

42.  Second, during that visit, Spencer said that he had experienced swelling (effusion) and pain following the softball injury.  Dr. Hutchinson explained that there are four common causes for those symptoms:  a patellar dislocation, a major ligament injury, a fracture, and a meniscus tear.  Spencer's other test results (a normal ligament examination and no evidence of a fracture or meniscus tear on Spencer's X-rays or MRI), ruled out all possible causes except the patellar dislocation.

43. Third, Dr. Hutchinson opined that the softball injury did not heal prior to the KFC fall because injuries of that type take more than a month to resolve.

44. Fourth, Dr. Hutchinson questioned whether comments in the emergency room records for Spencer's visit following the alleged fall were reliable given that Spencer did not reveal that he had injured his knee a month prior to that visit. He also noted that the mechanism of the alleged KFC fall – tripping and having a hyperextension injury where Spencer purportedly fell backwards onto his tail bone – was inconsistent with a patellar dislocation because "[a] hyperextension injury actually takes the pressure off of the patella." *Id*. at 79. On the other hand, a twisting sports injury was, according to Dr. Hutchinson, entirely consistent with a patellar dislocation.

45. Fifth, Dr. Hutchinson testified that Spencer's MRI results following the alleged KFC fall showed bone marrow edema involving the lateral femoral condyle and the medial aspect of the patella. According to Dr. Hutchinson, this is also consistent with a patellar dislocation that would have occurred during the softball game.

46. Finally, Dr. Hutchinson testified that Dr. Hill's records from Spencer's arthroscopic surgery – including notes regarding the presence of osteochondral loose bodies and the precise location of the lesion and problems with Spencer's patella – were consistent with a patellar dislocation. Based on the surgery reports, Dr. Hutchinson stated that he believed that Spencer would have needed arthroscopic surgery even if he had not had any issues relating to the alleged KFC fall.

*Dr. Treister*

47. Dr. Michael Treister, Spencer's expert, is a board certified orthopedic surgeon. In addition to reviewing medical records from Dr. James M. Hill, Northwest Community

Health Care, Castle Chiropractic, Athletico, and the Rolling Meadows Fire Department, he also reviewed the depositions of Drs. Hill, Hutchinson and Fleury. In addition, Dr. Treister examined Spencer on September 12, 2007.

48. Before his deposition, Dr. Treister did not personally review all of Spencer's medical records. Instead, he relied on a summary of the records prepared by his staff. He was unable to identify the person who summarized Spencer's records, but stated that medical technicians and/or front desk staff normally perform this task, and that doctors and nurses do not summarize records.

49. Dr. Treister opined that: when Spencer injured his knee on June 14, 2004, playing softball, he did not dislocate his knee; any injuries relating to the softball incident had resolved prior to the July 13, 2004 incident at the KFC; a substantive new injury occurred when Spencer visited the KFC on July 13, 2004; the MRI taken on July 24, 2004, suggested evidence of a new injury to the lateral femoral condyle and lateral patella; and Spencer's ongoing complaints are consistent with traumatically induced degenerative osteoarthritis that will progress with time so Spencer will eventually require a total knee replacement.

50. Dr. Treister testified that Dr. Hill's arthroscopic surgery treated problems caused by Spencer's knee bumping into the wooden door during his alleged fall at KFC. Dr. Hill's treatment notes and the emergency room records from Northwest Community Hospital on July 13, 2004, do not reflect that Spencer reported bumping his knee.

51. Dr. Treister testified that crepitus, or grinding in the knee, is the result of gradual and progressive deterioration of the cartilage of the knee over time after a traumatic injury, and that this deterioration leads to osteoarthritis and eventually the need for a total knee

replacement. Spencer's emergency room records from July 13, 2004, state that Spencer had crepitus in his right knee.

52. Dr. Treister based his testimony on, among other things, Spencer's veracity as a historian of his medical problems. Specifically, when forming his opinion, Dr. Treister accepted Spencer's representation that he was not suffering any symptoms relating to the softball injury at the time of the alleged fall at KFC. When forming his opinion, Dr. Triester was also unaware that after the softball injury, Spencer was diagnosed as having a large effusion.

53. On cross-examination, Dr. Treister was asked about physical therapy records from Athletico which provide that, "Patient [Spencer] states he had no previous history of knee problems prior to this incident." Plaintiff's Exhibit 17. Dr. Treister intimated that this statement appeared in Spencer's records due to insurance fraud on the part of the physical therapist rather than to a lack of candor on Spencer's part. Specifically, Dr. Treister testified that, "a lot of times a doctor will write down that the patient never had any back pain previously, or never had any hip pain previously. It may not be something that was actually discussed with the patient. So it may not be the fault of the patient. It may be the fault of the person doing the documentation. I'm just giving you that bit of information." Treister Transcript at 164.

54. Dr. Treister then clarified that in his own practice, "[he tries] not to" state that a patient does not have any history of a medical problem and is "pretty honest." *Id*. at 163-64.

55. Dr. Treister disagreed with Dr. Hutchinson's opinion that Spencer had a patellar dislocation caused by the softball injury. He based this opinion on information provided

by Spencer, his review of the MRI films taken on July 24, 2004, and the fact that Spencer did not have a retinacular tear.

**II.    Conclusions of Law**

1.    Under Illinois law, "[a] business owes its customers, as invitees, the duty to take reasonable care to avoid injuring them." *Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603, 604 (7th Cir. 2001) (collecting cases).

2.    To prevail on a premises liability negligence claim, a plaintiff must prove all elements of a common law negligence claim. *Lee v. Phillips Petroleum Co.*, No. 00 C 4070, 2001 WL 604189, at *2 (N.D. Ill. May 31, 2001). The elements of common law negligence under Illinois law are:  (1) the existence of a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) an injury proximately caused by that breach. *See Ward v. K-Mart Corp.*, 136 Ill.2d 132, 140 (Ill. 1990) (internal citations omitted).

3.    Illinois law defines duty as "an obligation imposed by law which requires one to conform to a certain standard of conduct for the protection of another against an unreasonable risk." *Fox v. Cohen*, 84 Ill. App. 3d 744, 748 (1980). A duty exists if the parties "stood in such a relationship to one another that the law imposed upon defendant an obligation of reasonable conduct for the benefit of plaintiff." *Ward*, 136 Ill.2d at 140. Although a business operator is not the insurer of his customer's safety, he owes his customers a duty to exercise reasonable care to maintain his premises in a reasonably safe condition for use by customers. *Id.* at 141.

4.    Additionally, a business owner is not liable for harm to an invitee caused by a condition on the premises if the invitee is aware of the condition or the condition is obvious. Thus, the Illinois Supreme Court has held that:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

*Genaust v. Illinois Power Co.* 62 Ill.2d 456, 468 (Ill. 1976).

5. Finally, with respect to proximate cause, "[t]he mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible." *Krivanec v. Abramowitz*, 366 Ill.App.3d 350, 359 (1st Dist. 2006). Instead, a plaintiff may recover only if he establishes that the defendant's negligence "more probably than not" caused his injury. *Holton v. Memorial Hosp.*, 176 Ill.2d 95, 106-07 (Ill. 1997).

6. The court will focus on proximate cause, as this issue is dispositive. The four main witnesses in this case were Spencer, Dr. Hill, Dr. Hutchinson, and Dr. Treister. Dr. Hill testified via deposition, and Spencer and his other doctors testified at trial. With respect to the witnesses who testified at trial, the court carefully listened to their testimony and observed their demeanor. The court also reviewed the qualifications and experience of the medical witnesses and took the fact that Dr. Hill was Spencer's treating physician into account.

7. The court finds that Spencer was not a credible witness. First, the court is troubled by Spencer's ongoing decision to conceal his softball injury – which occurred slightly less

than a month prior to the KFC incident – from his caregivers, whether in the emergency room, ambulance or physician's office. The court flatly rejects Spencer's attempt to convince it that none of the professionals who treated him after the alleged fall ever asked him if he had any prior problems with his knee. At trial, the court was left with the firm conviction that Spencer's testimony to this effect was simply untruthful.

8.    Indeed, the medical records show that Spencer was repeatedly asked whether he had any history of knee problems following the KFC incident. The EMS Rescue and Ambulance Report for Spencer's transport from KFC to the Emergency Room states: "PAST MEDICAL HISTORY: None." The emergency room records similarly state, "Past Medical History: None" and do not indicate that Spencer ever informed anyone at the ER that he had been treated at that same ER a month before for another injury to his right knee. Dr. Hill's treatment notes for July 22, 2004, explicitly state that Spencer "denies any previous history of knee problem or injury." Finally, Spencer did not inform the therapist at Athletico that he had sustained a knee injury previous to the KFC incident.

9.    The court also finds that Spencer's efforts at trial to downplay the significance of the softball injury show a lack of veracity. Spencer testified that two days after the softball injury, he went to the emergency room for treatment of his right knee (which is necessarily used when driving). Spencer had his own car, but his neighbor drove him to the emergency room. According to Spencer, "there was no reason" why he could not drive himself. The court finds that this answer is not forthright.

10.   It is important to note that immediately after the softball injury, Spencer's statements support the conclusion that he had a twisting-type injury to his knee. According to Spencer, he hit the ball, ran the bases and in the process "slid in the sand, twisted and fell

down."  At the emergency room, Spencer informed the treating physician that during the softball incident, his knee twisted and "dislocated," and that he felt it pop.  The emergency room records following the softball injury quote Spencer as stating that his "knee dislocated but popped back in."

11.	In contrast, the alleged KFC fall, according to Spencer, caused his foot to slide out from underneath him, at which point he "contortioned [sic] and twisted."  Spencer testified that after this, his "left arm swung up and hit the door frame of the door opening, and then at that point I pulled the door, hit my knee and then twisted my body and fell backwards."  Following this incident, Spencer told the emergency room staff that "[he] had hit [his] arm and landed on [his] tailbone."

12.	Dr. Hill is an entirely disinterested and well qualified doctor who treated Spencer following the KFC incident.  Dr. Hill not only is a treating physician but also was able to view the inside of Spencer's knee when he performed arthroscopic surgery on Spencer's knee.  Dr. Hill treated Spencer based on information provided by Spencer.  Thus, he initially accepted that Spencer did not have any knee issues prior to the KFC incident and that Spencer slipped on a wet floor while walking to the bathroom at the KFC, resulting "in a hyperextension-type injury to his right knee when [Spencer] fell backwards landing on his buttocks."

13.	Although Dr. Hill originally thought that Spencer's knee problems were attributable to the KFC incident, once he found out about the softball injury, he opined that the effusion diagnosed after the softball injury was "this same knee joint effusion that we've be [sic] evaluating the whole time."  Hill Deposition at 49.  He then stated that he could not testify within a reasonable degree of medical certainty that Spencer's knee problems

were in fact related to the KFC incident. He also testified that the probability that Spencer was experiencing symptoms caused by the June 14, 2004, softball injury was greater than the probability that the injury had resolved before the July 13, 2004, KFC incident. Dr. Hill was intimately familiar with Spencer's knee and provided cogent, clear testimony about the basis of Spencer's knee problems. The court thus gives great credence to his unbiased medical opinion and finds that it does not support a finding of proximate cause tying Spencer's current problems to his alleged fall at the KFC.

14.     Dr. Hutchinson, KFC's expert, testified at length about his opinion that Spencer had a patellar dislocation during the softball game, and that Spencer's lateral femoral condyle bone bruise was more likely than not the result of a patellar dislocation. Dr. Hutchinson is a well qualified and board certified orthopedic surgeon who presented a simple and readily understandable explanation for Spencer's knee problems that is consistent with Spencer's medical records. Although the court took the fact that Dr. Hutchinson was KFC's expert and did not personally treat Spencer into account, it nevertheless finds that he was very credible and that his opinion was well-supported by Spencer's medical records. It thus accepts his opinion that, to a reasonable degree of medical certainty, the osteochondral lesion of the lateral femoral condyle in Spencer's right knee was caused by the softball injury on June 14, 2004, and not by the alleged fall at KFC.

15.     The court also carefully considered the testimony of Spencer's expert, Dr. Treister, who is a board certified orthopedic surgeon. Dr. Treister reviewed portions of Spencer's medical records as well as a summary of Spencer's medical records prepared by his staff. He also examined Spencer on September 12, 2007.

16.    Fundamentally, Dr. Treister's opinion is intertwined with information provided by

Spencer.  For example, Dr. Treister accepted Spencer's statement that any injuries

relating to the softball incident had completely resolved prior to the incident a month

later at the KFC.  The court, as outlined above, has rejected Spencer's testimony to this

effect.  Dr. Treister also adopted the position that Spencer severely bumped his knee

during the alleged KFC fall.  This is inconsistent with Spencer's testimony providing a

very detailed description of his alleged fall and contemporaneous documentation of the

details relating to the alleged fall which, at best, show a glancing bump. Moreover, no

evidence suggests that the therapist at Athletico falsely wrote that Spencer denied any

history of prior knee problems in an attempt to have Spencer's treatment covered as a

new injury.  Nevertheless, Dr. Treister uncritically accepted Spencer's version of events

and flatly discounted the therapist's notes in order to support his theories about Spencer's

knee problems.

17.    In sum, with all due respect to Dr. Treister, the court is reminded of an observation made

by Charles Babbage, who is known as the "Father of Computing."  He said, "I have been

asked, — 'Pray, Mr. Babbage, if you put into the machine wrong figures, will the right

answers come out?' . . . .  I am not able rightly to comprehend the kind of confusion of

ideas that could provoke such a question."  BABBAGE, CHARLES, PASSAGES FROM THE

LIFE OF A PHILOSOPHER 67 (Longman and Co. 1864), available online at

http://djm.cc/library/ Passages_Life_of_a_ Philosopher_Babbage_edited.pdf (last visited

on January 28, 2009).  In other words, where an opinion is based on incorrect

information, it simply will not be reliable.

18. Dr. Treister also acknowledged that crepitus, or grinding in the knee, is a degenerative condition that follows a traumatic injury. Spencer's emergency room records from July 13, 2004, following the KFC incident, state that Spencer had crepitus in his right knee. Dr. Treister's opinion that the softball injury had resolved and that the alleged KFC fall was the sole cause of Spencer's knee problems is inconsistent with the finding that Spencer had crepitus immediately after his fateful visit to the KFC.

19. Finally, after postulating his insurance fraud theory to explain the physical therapy notes reflecting Spencer's affirmative statement that he had no pre-existing knee issues prior to the alleged KFC fall, Dr. Treister testified that in his own practice, "[he tries] not to" falsely state that a patient does not have any history of a medical problem and is "pretty honest." The court holds witnesses to a higher standard than "pretty honest." Based on its evaluation of Dr. Treister's testimony, the court concludes that his theories about Spencer's knee are, at best, "contingent, speculative or merely possible." *See Krivanec v. Abramowitz*, 366 Ill.App.3d at 359. They certainly do not cast any doubt on the opinions of Dr. Hill and Dr. Hutchinson regarding the softball injury and the KFC incident or show that the alleged KFC fall more probably than not is at the root of Spencer's knee problems. The court thus finds that Spencer has failed to carry his burden of establishing proximate cause. Accordingly, it will not address the parties' remaining arguments.

## III.  Conclusion

For the above reasons, Spencer has failed to carry his burden of establishing that his alleged fall at the KFC, as opposed to his softball injury, is the proximate cause of the problems

with his right knee.  Accordingly, judgment is entered in KFC's favor.  The clerk is directed to

enter a Rule 58 judgment to this effect and to terminate this case from the court's docket.


DATE:     February 3, 2009

_Blanche M. Manning_
Blanche M. Manning
United States District Judge